J. W. Kutchera, Appellant, v. W. S. Graft et al., Appellees.

**LANDLORD AND TENANT:** Condition of Premises—Presence of Hog
Cholera.　An action by a tenant against a landlord for damages
consequent on the fraudulent concealment by the landlord of the
presence of hog cholera on the leased premises requires proof that
the landlord:
　　1.　Had actual knowledge of the presence of said disease on the
premises, and
　　2.　Designedly concealed such presence from the tenant.
　　*Gross neglect* to inform the tenant of the presence of such disease
will not mature a cause of action.

*Appeal from Linn District Court.*—F. O. Ellison, Judge.

SEPTEMBER 20, 1921.

Action to recover damages against defendant landlord,
based on fraudulent concealment of hog cholera infection of the
leased premises, from which the tenant claims his hogs con-
tracted cholera and died.　There was a directed verdict for de-
fendant, and judgment thereon against plaintiff for costs.　Plain-
tiff appeals.　Facts appear in the opinion.—*Affirmed.*

*Ring & Hann,* for appellant.

*Voris & Haas,* for appellees.

Arthur, J.—Defendant W. S. Graft owned a farm, located
about a mile southwest of Central City, in Linn County, Iowa.
On September 26, 1918, plaintiff leased the farm for the period
beginning March 1, 1919, and ending March 1, 1921, and, on or
about March 1, 1919, moved from North English, where he had
been living, to the farm, and took with him 11 brood sows and 28
shoats and pigs.　The hogs were shipped in one car.　After plain-
tiff moved on the Graft farm, the sows farrowed 66 pigs.　On
arrival at the farm, the hogs were placed in a small lot near the
barn, and kept there three or four days, and then permitted to
run in a field of 15 or 18 acres.　In the latter part of March,

many of plaintiff's hogs became sick and died. Plaintiff employed Clifford Moles, veterinarian, who treated and vaccinated the hogs. Moles says he was first called April 6th. A Mr. Rich had occupied the premises as tenant, the year preceding March 1, 1919. Rich's hogs had cholera in August, 1918. Dr. Moles vaccinated 25 of the hogs by what is called the "double treatment." Some of them died. After that, he was on the premises a few times in September. A government inspector visited the premises, during the presence of cholera in August. Moles posted a quarantine notice on the east side of the barn, where it could be plainly seen from the road, or by anyone coming on the premises. After treating the hogs, Moles turned them over to the government inspector, and gave Rich directions as to disinfecting the premises, and told Rich that he had better burn the dead hogs; that, if he buried them, he should bury them six feet deep, and cover them with quicklime; and that that would be safe. On September 27, 1918, plaintiff was on the farm and about the buildings, and was again on the farm in December, 1918, and was not afterwards on the farm until he moved, on March 1, 1919. When plaintiff's hogs became sick, the latter part of March, he employed Veterinarian Moles to treat them. Dr. Monger, a government veterinarian, went with Dr. Moles to the premises. Drs. Moles and Monger posted four or five of the Kutchera hogs; and found that they had cholera. On April 7th or 8th, Moles and Monger were on the premises. They found portions of carcasses, not well covered up, in a ditch about 80 rods from the barn. The carcasses had been covered, and the dirt washed away. The carcasses were decayed so that they made no examination. They saw two carcasses, and these were only partially exposed. Kutchera showed them the two carcasses, and did not point out any more. There was one carcass on top of the ground, three or four rods from the barn. Moles vaccinated 44 head of the Kutchera hogs.

W. S. Graft died before the trial, and the administratrix of his estate was substituted as defendant.

Plaintiff testified that the physical condition of his hogs when he took them to the Graft farm was good—was healthy.

Plaintiff's charge of fraudulent concealment consists of what he claims to be the facts that Rich's hogs had been diseased

of cholera in the fall of 1918; that W. S. Graft had knowledge that some of Rich's hogs had died from cholera; that the hogs which died of cholera were not properly buried, and that W. S. Graft knew that they were not properly buried; and that W. S. Graft in no way informed the plaintiff of such facts; that the plaintiff was ignorant of such facts; and that Graft, having knowledge of such facts and conditions, deliberately, willfully, and wrongfully concealed from plaintiff such facts.

Plaintiff further charges negligence on the part of Graft in failing to disinfect the premises.

In support of his charge that Graft knew that Rich's hogs had cholera in the fall of 1918, and knew how the dead hogs were disposed of, he offered the testimony of his 17-year-old son, Robert Kutchera, who testified that Graft was on the farm several times after they moved there; that he heard a conversation between Graft and his father at the dinner table at their house on the farm, wherein "Mr. Graft told my father that he had told Rich to bury the hogs up there. He pointed toward the direction of the west field at the time. At another time, he told my father that the man on the farm before Rich did not have cholera among his hogs, but that Rich's hogs did."

Mrs. J. H. Lapham, who was employed as a domestic in the Kutchera home during the months of March and April, 1919, testified to a conversation that she heard between Kutchera and Graft at the dinner table, wherein she reports Graft as saying:

"Mr. Graft said he wanted Rich to bury the hogs. * * * He said he told Rich he ought to bury them."

Bertha Kutchera, wife of plaintiff, testified that she heard a conversation between Graft and her husband in April, 1919, at the dinner table, wherein Graft said that Rich's hogs had died with cholera, and he told him to bury them up there.

"He pointed west of the house. I heard my husband tell Mr. Graft that he thought he ought to pay him for the loss; that he knew there was cholera on the place: and he answered, 'I will not pay for them; go to Rich,—he is responsible for them.' "

Robert Hass, brother-in-law of Kutchera, who was working for Kutchera, testified that, about April 25th, Mr. Graft came

out to the farm; and that, in a conversation with him, Graft spoke about the Rich hogs that had died, and said that it was cholera, and that he had told Rich that it was a poor place to bury them, where he had buried them.

R. C. Hatch, a township trustee, testified that, in the latter part of April, 1919, Graft notified him that Rich had buried hogs in a ditch, and that Rich should look after them; that he went and saw Rich, but Rich did not bury them; and that, later on, Mr. Graft buried the hogs himself. Hatch said:

"Graft wanted me to see Rich, and have him attend to burying the hogs; that Rich should have burned them, or buried them out on the hill, where they would not wash."

There was testimony bearing on damages, which need not be discussed.

At the close of plaintiff's testimony, defendant moved for a directed verdict in his favor, which was sustained, the motion being:

"1. There is no evidence of fraud or deceit or concealment on the part of the deceased, W. S. Graft, and in the absence of such evidence there is no liability on the part of deceased, or the representatives of his estate.

"2. There is no evidence that the deceased, W. S. Graft, knew there had been cholera on the premises, and no evidence that he knew the hogs had been left in the ditch uncovered; no evidence to show that he had any knowledge, or that knowledge could be imputed to him.

"3. It appears the deceased was not in the occupancy of the premises preceding the occupancy of the plaintiff, but that the premises had been occupied by a tenant, a one Fred Rich. It does not appear that the premises were under the control of the deceased in the fall of 1918, down to the first of March, 1919, and no knowledge of the conditions can be imputed to him because of his relations and landlord.

"4. It does not appear that the dead hogs found on the premises in April ever had the disease known as cholera.

"5. It does not appear that the plaintiff's hogs contracted the disease directly or indirectly from the dead hogs found on the premises in April, or from any other infection on the premises.

"6. There is no evidence that plaintiff's hogs contracted the disease from any conditions existing on the premises. The most that can be claimed is that conditions existed which might have caused the disease; but whether such disease was caused by the conditions is but mere surmise, speculation, and conjectural. The relation of cause and effect is not shown.

"7. On the whole record, plaintiff is not entitled to recover; or if a verdict were returned for him against the defendant, it would be the duty of the court to set it aside."

It was established by the evidence that there was cholera in Rich's herd of hogs during the season of 1918, when he was a tenant on the Graft farm, and that the ravages of the disease began in August and continued into and ended in September. Perhaps it ended early in September; for, late in September, at the time Kutchera entered into his lease with Graft, he and Graft were on the farm and went over it and about the buildings, and evidently discovered no trace of hog cholera on the premises. Again in December Kutchera was on the premises, and discovered nothing wrong. Veterinarian Moles treated and vaccinated the hogs, a government inspector assisting him. Some of the hogs died, but the record does not disclose to what extent the herd died. The veterinarian instructed Rich how to dispose of the carcasses. The record does not disclose anything more about cholera on the farm, or concerning the disposition of the hogs that died, until along in April, when cholera broke out in the herd of Kutchera. Then it was that Mr. Graft was out on the farm and took dinner with the Kutchera family, and conversation arose at the dinner table about Kutchera's misfortune, and about the disposition of some hogs that Rich had lost, the season before. Members of the Kutchera family testify to statements then made by Graft. This and the testimony of Hass and Hatch constitute the only testimony tending to show that Graft knew of cholera in the Rich herd.

The record does not disclose when the knowledge that Rich's hogs had the cholera came to Graft. At the time of the dinnertable conversation, all in any way interested, and probably everybody in the neighborhood, had come to know that there had been cholera in the Rich herd. The record does not disclose that Graft was on his farm after the latter part of September, when

he was there with Kutchera to show him the farm, until in April, more than six months after disease had been in Rich's herd. It does not appear that Graft was on the farm while Rich's hogs were sick, or that he had any personal knowledge of the situation. After Graft was informed of Kutchera's loss of hogs, and Kutchera wanted him to pay the loss, Graft then, upon learning from Kutchera that some hogs had not been properly buried, cast blame upon Rich for not properly burying the hogs. It does not appear that Graft knew that the hogs were not properly buried, until told so by Kutchera. We find no evidence in the record that Mr. Graft knew of hog cholera on the farm, at the time of the execution of the lease. Robert Kutchera, witness, reports Graft as saying that "he told Rich he ought to bury them." Testimony of admissions by Graft, who was dead at the time of the trial, should be scrutinized carefully. The claimed admissions by decedent Graft, we think, do not go to the broad extent claimed by counsel for plaintiff. It is true that there is testimony tending to prove that, some time in April, Graft made a statement to Robert Hass, Kutchera's brother-in-law, to the effect that he knew where the hogs were buried, that had died with cholera, and that he told Rich that "it was a poor place to bury them, where he buried them." But this was in a conversation in which Graft was intimating that Rich was blamable. But against this, Robert Kutchera, son of plaintiff, says that, in a conversation the latter part of March, Graft told his father that he told Rich to bury the hogs up there, pointing to the west. Mrs. Lapham, probably at the same time, heard Graft say that he wanted Rich to bury the hogs. Mrs. Kutchera, wife of plaintiff, says that she heard—what was probably at the same conversation—Mr. Graft say that Rich's hogs had died with cholera, and he told him "to bury them up there," pointing to the west. These statements were made in a general conversation. The parties who testified to them were of the Kutchera household, and swayed by motives of bias or self-interest, and are subject to the infirmities of memory. The statements purport to have been made a year before the trial, and the memories of the witnesses might be so imperfect as to leave them with only an impression of the substance, which may have been at variance with the meaning intended to have been

conveyed. Testimony of admissions is ordinarily received with caution. 1 Greenleaf on Evidence (14th Ed.), Section 200; *Holmes v. Connable,* 111 Iowa 298. Outside of these admissions, there is no evidence tending to show that the deceased, Mr. Graft, had knowledge that there had been hog cholera on the farm while Rich was a tenant. These statements were made in April, 1919. We think this evidence does not prove that Graft knew that Rich's hogs had cholera, at the time the lease was made, on September 27, 1918. Nor does it prove that Graft concealed the facts, if he knew them. Nor does it prove that he designed to mislead the plaintiff, or that he deceived him in any way. Even if Mr. Graft knew that Rich's hogs had had cholera, it cannot be said that he was guilty of fraud in failing to inform Kutchera at the time the lease was made. If the premises had been disinfected and the dead hogs buried or burned, as Rich was directed by Doctor Moles and the government inspector, there would have been no danger in March, five months afterwards.

Then it must follow that Graft actually knew, at the time the dead hogs were buried, that they were not properly buried. But his claimed admissions do not go so far. The only thing that his admissions—giving to them their utmost probative force —tend to prove, is that he told Rich to "bury them over there," at the time pointing to the west. Moles had told Rich to burn the carcasses, or to bury them six feet deep and cover them with quicklime. Even if Mr. Graft had suggested to Rich a place to bury the hogs, there is no evidence that he knew, or had reason to believe, that they would not be properly and safely buried. In fact, according to the witness Hass, it appears that Graft was complaining because Rich had buried the hogs at an improper place. This is not inconsistent with his statement at the dinner table that he "told Rich to bury them up there;" for to Robert Hass he criticized Rich for attempting to bury them in a ditch, or ravine, saying that that was not a proper place. Kutchera's claim is that his hogs contracted cholera by coming into contact with the hogs of Rich, which had died of cholera and had been improperly buried. The evidence will permit plaintiff no other theory; for there is no evidence that the farm carried the infection otherwise. Plaintiff is reduced to the claim that his damage resulted from the improper burial of the deceased

animals. If there is actionable fraud in the instant case, it must be because of the knowledge of Graft and concealment by him of the fact that the animals had not been safely buried; and this knowledge and concealment must have been at the time of the execution of the lease. Assuming that the animals found by Kutchera died from cholera, when did Graft acquire such knowledge? He did not live on the farm. Rich was in possession and control of the farm. It does not appear that Graft was at the place where the hogs were buried until after Kutchera went on the place. So far as appears from the evidence, Mr. Graft never knew of the improper burial of the hogs until he was informed of the fact by Kutchera, the last of March or the 1st of April, 1919.

It may be urged that he should have known of the facts. But he was not in the occupancy of the farm himself, and is not shown to have been upon the farm until he helped Kutchera move, on March 1st. In any event, fraud cannot be predicated on negligence, however gross. There must have been an intention to deceive. Moreover, it was not shown by any evidence that the carcasses found by Kutchera in April were those of hogs that had died from cholera. Perhaps it may be inferred that the hogs found by Kutchera in the ditch, partially exposed, were victims of cholera. It was not to be presumed that Rich would violate the law, or even be guilty of negligence in the disposition of the dead hogs, especially when he was under the supervision of a veterinarian and a government inspector, who told him what to do. Rich's hogs did not die from cholera after September, 1918, nor did they all die. More than six months intervened before it was discovered that some hogs had not been properly buried. Rich may have lost other hogs after September. It is not shown that the hogs found partially exposed in the ditch died from cholera. It may be that these hogs, the bodies of which were found, did not die of hog cholera, and that for that reason Rich did not burn the bodies or bury them under a coating of quicklime. Criminality or negligence is never presumed, but must be established by proof. The record does not speak as to the cause of the death of these particular hogs which were found partially exposed, not properly buried, in a ditch. A strong inference may be conceded that the source of infection of

the Kutchera hogs was the carcasses of the Rich hogs. Prevalence of hog cholera and how it is transmitted are often difficult to account for, and baffle experts. Will the germs, if it is a germ disease, survive the sunlight and cold of an Iowa winter? Will they retain their vitality in a body exposed to sunlight and the freezing and thawing of winter, so that after six months they will transmit the disease? The record is silent about these matters. The veterinarians did not examine the bodies which were found exposed, to ascertain the disease which attacked them. Without proof that the carcasses found had been infected with cholera, without proof that there were cholera germs, and that the germs would retain vitality for six months, through fall, winter, and spring, it is sought to make the estate of W. S. Graft, deceased, liable for Kutchera's loss. The period of incubation does not appear in the record; and it is not to be presumed that, because the disease manifested itself in about three weeks after Kutchera moved to the Graft farm, his hogs could not have acquired the germs .of the disease before coming to the Graft farm. The record leaves us in a field of inference, speculation, and conjecture with reference to these matters, where the law requires reasonable certainty,—at least, more than a mere possibility.

Counsel for plaintiff sought to have the inference drawn that the Kutchera hogs contracted cholera by coming in contact with the bodies of diseased hogs, improperly buried. But we think the proof is lacking here. True, Rich's hogs had cholera in August and September, 1918; but Dr. Moles, the veterinarian, and a government inspector gave Rich directions to burn the dead animals, or to bury them six feet deep and cover with quicklime. It is not shown that Rich did not bury the body of every hog dying from cholera, or that he did not bury them as directed. This was in August and September. Rich had other hogs that did not die at that time. How many died does not appear. The fact that some carcasses were found on the premises some six months later does not prove that they were the carcasses of hogs that had died from cholera. Farmers lose hogs from various causes. It is only fair to presume that Rich would comply with the law relative to the disposition of bodies of hogs dying from cholera; or, at least, that he would dispose

of them according to the directions of the veterinarian and the government inspector. At least, criminality or negligence is never presumed. As to hogs which died from other causes, he may have been careless. It is not established that the carcasses found were those of cholera-killed hogs. The carcasses were not examined, to ascertain the disease which attacked them.

The basis of the alleged liability of defendant's decedent is founded and rests upon a fraudulent concealment of a known danger. As we interpret it, this was the theory upon which the petition was drawn. The relation of Kutchera and Graft was created by the lease. As we understand the general rule, it is that the lessor, in the absence of fraud or of any agreement to that effect, is not liable to the lessee for the condition of the premises, and that the premises may be safely used for the purposes for which they are intended. Plaintiff's claim, therefore, must be bottomed on an inducing of the contract by fraud. *Jaffe v. Harteau,* 56 N. Y. 398; *Cate v. Blodgett,* 70 N. H. 316 (48 Atl. 281); *Boyer v. Commercial Bldg. Inv. Co.,* 110 Iowa 491; *Starr v. Sperry,* 184 Iowa 540; *Willis v. Snyder,* 190 Iowa 248.

Authorities cited by counsel for plaintiff do not hold to the contrary, except *Hines v. Willcox,* 96 Tenn. 148 (54 Am. St. 823), and the later opinion in the same case, *Willcox v. Hines,* 100 Tenn. 538 (66 Am. St. 770). It is held in the *Hines* case that recovery may be had for mere negligence. But this case seems to stand quite alone. It is contrary to the weight of authority, and is not authority in this jurisdiction. *Shingle, Wilson & Kreis Co. v. Birney & Seymour,* 68 Ohio St. 328 (67 N. E. 715). In *Bowe v. Hunking,* 135 Mass. 380 (46 Am. Rep. 471), the court said:

"That no action lies by a tenant against a landlord on account of the condition of the premises hired, in the absence of an express warranty or of active deceit."

With the exception of the Tennessee cases, so far as we discover, the courts hold to the doctrine that the liability of the landlord must be grounded on deceit.

We think the court did not err in sustaining defendant's motion for a directed verdict. The judgment of the court below is affirmed.—*Affirmed.*

EVANS, C. J., STEVENS and FAVILLE, JJ., concur.