**WILLCOX et al. v. DENSON et al.***
(No. 6956.)

(Court of Civil Appeals of Texas. Austin.
Feb. 9, 1927. Rehearing Denied
March 9, 1927.)

**1. Landlord and tenant ⬅➡168(2)—Tenant must at his peril discover defects in premises open to observation.**

Under common law, defects in leased premises open to observation must be discovered by tenant at his peril.

**2. Landlord and tenant ⬅➡166(10)—In absence of fraud or agreement, tenant cannot recover for injury from latent defects of which lessor did not know at time of lease.**

Under common law, in absence of warranty, deceit, or fraud, or agreement for repairs, other than that they shall be at lessee's expense, unless by special agreement lessor undertakes to pay for them, injuries resulting from latent defects in the premises of which lessor had no actual knowledge at time of lease cannot form the basis of recovery by tenant.

Appeal from District Court, Bell County; Lewis H. Jones, Judge.

Action by J. Lane Denson, Jr., and another, against Mrs. Annie E. Willcox and others. Judgment for plaintiffs, and defendants appeal. Reversed and rendered.

Cox & Brown, of Temple, for appellants.
Winbourn Pearce and W. W. Saulsbury, both of Temple, for appellees.

McCLENDON, C. J. J. Lane Denson, Jr., and W. T. Hefley, as partners, plaintiffs below and appellees here, brought this suit against Mrs. Annie E. Willcox, individually, and F. F. Downs and A. L. Flint, as executors of the estate of George E. Willcox, deceased, defendants below and appellants here, to recover compensatory damages caused by the falling of the west wall of a building which plaintiffs were occupying as tenants of defendants. Trial to jury upon special issues, and judgment for plaintiffs against defendants for $7,000, with interest and costs. Defendants have appealed.

We have reached the conclusion that under the jury findings the judgment should have been in favor of defendants, and will state so much of the record as we deem pertinent to this conclusion.

The court submitted seven special issues of his own and three at defendants' request. These latter will be designated D1, D3 and D4. The substance of these findings, some of which we quote in full, follows:

1. That the wall was "built wholly or partially of inferior and unsafe brick."

2. That this was "the proximate cause" of the wall's falling.

3. That the wall was built "of inferior and unsafe material."

4. That this was "a proximate cause" of the wall's falling.

5. That the wall was in an unsafe and dangerous condition at the time the building was leased to plaintiffs.

6. "Do you find from a preponderance of the evidence that the defendant, her agents or employees, knew or in the exercise of ordinary care would have known of such unsafe and dangerous condition of said wall, if it was. at the time of its lease? Answer yes or no." Answer: "Yes."

7. That plaintiffs' damage was $7,000.

D1. "Do you find from a preponderance of the evidence that the defendants, Mrs. Annie E. Willcox, or her agents, F. F. Downs and A. L. Flint, or either, knew, at the time the building was leased to the plaintiffs, the wall in question was in an unsafe and dangerous condition?" Answer: "No."

D3. That the unsafe and dangerous condition of the wall was not "as open, apparent, and obvious" to the plaintiffs as to the defendants at the time the building was leased to plaintiffs.

D4. That plaintiffs in the exercise of ordinary care would not have known of such dangerous and unsafe condition.

The evidence, viewed most strongly in support of these findings and without reference to conflicts, shows: The building under lease to plaintiffs was one of several contiguous structures in the town of Temple, known as the Willcox Block. The property upon which these buildings was situated faced south on West avenue from South First street on the west to an alley on the east, a distance of approximately 110 feet, and had a depth north and south of about 90 feet, with the exception of a rectangle 20 by 40 feet out of the northwest corner. The property under lease to plaintiffs was the east 50 by 90 feet. The building on this portion of the property was divided up on the ground floor as follows: On the east, fronting 25 feet on West avenue and 55 feet on the alley, was the American Café. Immediately west was the American Confectionery, which had a frontage of 25 feet on West avenue and extended back 55 feet. To the rear of the American Café was the café kitchen, which had an alley frontage of 25 feet and a depth of 40 feet. To the north of this kitchen was a storeroom with a 10-foot alley frontage and a depth of 40 feet. Immediately west of this kitchen and storeroom and to the north of the American Confectionery was another storeroom, 10 feet east and west by 30 feet north and south. Partitions divided these several compartments. The remaining frontage on West avenue to the west of this building was occupied by another building with three compartments on the ground floor, in the following order: Booker's Drug Store, with a frontage of 20 feet; American Printing Company, with a frontage of 15 feet; and Openheimer's Jewelry and Pawn Shop, with a frontage of 25 feet. These compartments had a depth of 60 feet. To the north of these

compartments and to the west of the store-room, which was north of the American Confectionery, was an open court or yard. The buildings fronting on West avenue were two stories in height. The entire ground floor and second story of the eastern 50 feet of the property was under lease to defendants. The second story above Booker's Drug Store was occupied by the American Legion for club room purposes, access to which was from a stairway between the printing company and jewelry shop. The wall which fell was the west wall of the American Confectionery, which was the east wall of Booker's Drug Store. It was a 13-inch solid brick wall, commonly known as a fire wall, and extended up some 2 feet above the roof of the adjacent buildings.

The history of these buildings, so far as pertinent, is substantially as follows: Prior to 1883 the entire property on which the Willcox Block is located was vacant. C. M. and R. B. Gooch acquired in 1883 the southeast corner of the property, fronting 50 feet on West avenue and extending back along the alley 60 feet. About September of that year they constructed on this property a two-story brick building, the west wall of which was the wall which fell. A very short time thereafter the owner of the property immediately west constructed a building and joined onto this wall, under a party wall agreement. On November 17, 1883, the Gooches conveyed the property to Geo. W. Willcox, who owned it up to his death, on the 15th day of November, 1915. The other portions of the property were acquired by Geo. E. Willcox from the then owners in the years 1886 and 1907. Mrs. Willcox acquired the property under the will of Geo. E. Willcox, of which Downs and Flint were independent executors. As such executors they wound up the estate, and from that time were Mrs. Willcox's agents with reference to the property. The evidence indicates that some additions were made to the property by Geo. E. Willcox not very long after he acquired it, but there was no change made in the wall which fell. These additions consisted of an extension of the Booker Drug Store building to the rear, and the erection of the extensions to the north of the American Café and American Confectionery. The Booker Drug Store was under lease by J. J. Booker, who at the time the wall in question fell, on October 6, 1923, had been a tenant in the property for thirty-five years; his tenancy antedating the acquisition of the property by Geo. E. Willcox. He had been a tenant under a five-year lease which expired on January 1, 1917. He thereafter held over under an agreement without a written lease and without any definite understanding as to the duration of his tenancy. The rental was advanced $10 per month one or two years before the collapse. The plaintiffs acquired the American Confectionery about the year 1919, purchasing the fixtures

and good will of the then owners, as well as their leasehold interest, which expired August 31, 1923. On September 1, 1922, a lease was executed by Downs and Flint, as "executors for Mrs. Geo. Willcox," leasing the American Café room to plaintiffs for a period of three years, ending August 31, 1925. This lease provided:

"All repairs upon said property herein leased during the time that the same may be leased, shall be at the expense of said lessee, unless by special agreement the said lessor undertakes to pay for the same."

About the time plaintiffs acquired the American Café and secured the lease last referred to, they had an agreement with the defendants that they were to have a lease of all of the rest of the building, both upstairs and downstairs, that they had not already leased from defendants for the American Café, and that this lease was to be of the same duration and under the same general terms, except as to amount of rental, as the American Café lease of September 1, 1922. The evidence as to repairs on the building up to the year 1916 or 1917 is exceedingly meager. Whatever repairs were made up to that time were of a minor nature. In 1916 or 1917, Downs and Flint, acting for Mrs. Willcox, had an entirely new front erected for the "block." The old front was torn down almost entirely and reconstructed of steel beams, marble, plate glass, and brick. This front was "tied" onto the partition wall that fell. In this reconstruction the latter was cut back from one to two feet in order to effect the tieing onto the new front. In this way the entire vertical cross-section of the wall that fell was exposed to observation; and it may fairly be inferred that the then character and condition of the material of which it was constructed might, upon proper inspection, have been determined. Shortly after plaintiffs had acquired the American Café, the stairway between the confectionery and the café, which at that time had its entrance on West avenue, was moved back further into the building, and a passageway left in front of the stairway between the café and confectionery. This work was contracted for by plaintiffs under permission of defendants to have it done, and with the agreement that $150 of the cost was to be borne by defendants, which agreement was carried out. At various times, there had been some repair done to the roof which showed leaks where it joined the partition wall. These repairs were of a minor nature and the expense was borne by Mrs. Willcox. It was undisputed that Mrs. Willcox had no personal knowledge of the condition of the building, nor of any repairs that were done, or any other matters in connection with the property further than as reported to her by her agents Downs and Flint. There is some evidence that at one time there was a second

story door in the partition wall that fell, and that this door had been bricked up many years before. The evidence on this point is very meager.

Early in the year 1923, Booker applied to Downs and Flint to have the floor in the rear of the drug store repaired, and this was finally agreed to by Downs and Flint. Contractors were employed to do this work, who were paid by Mrs. Willcox. At that time this particular compartment was occupied by a drug store. The front part of the drug store appears to have had a tile floor; the rear 20 feet which extended from the prescription case north was of wood, and was very much dilapidated. The contractors who began this work found the floor in such condition that they advised putting in a cement floor. One of the reasons for this advice was the fact that in the northeast corner of the storeroom was a hydrant, which often caused the floor to be wet. Downs and Flint agreed to this change. While the contractors were engaged in putting in the cement flooring, they found it necessary to remove 18 feet of shelving which was against the east wall of the store, extending from the prescription case to the north wall. In moving out this shelving some of the plastering fell off and some of the brick fell out of the wall. Witnesses are not agreed as to the number of brick falling out of the wall, nor as to other details in connection with this matter. But the evidence is sufficient to warrant a finding that it was then discovered that some of the plaster between the brick in the wall had become decomposed and some of the brick was soft and could be broken or crumbled by hand. The attention of Downs and Flint was called to the fact that some of the plaster had fallen and some of the brick had come out of the wall, and they authorized, as the witnesses expressed it, "that this be fixed." The contractors replaced the brick that had fallen out and replastered the wall.

This entire partition wall suddenly collapsed about 8 o'clock a. m., October 6, 1923. A number of contractors made an examination of the débris in order to determine the cause of the collapse. The witnesses quite generally agreed that they found the wall largely constructed of what they denominated "sand brick." Different estimates as to the percentage of this grade of brick in the wall was given by the different witnesses. Some of them placed the amount of sand brick in the wall at 75 to 90 per cent. It was in evidence that this was an inferior grade of brick and was not regarded good construction even in 1883, when this building was erected. However, it was shown that where used in a wall which was kept perfectly dry the life of sand brick was practically indefinite. The chief injury was from becoming wet. The mortar used was also found by at least some of the witnesses to be inferior and subject to deterioration from being wet or damp. The evidence amply warrants the finding that the cause of collapse was from inferior material used in the construction of the walls, and it is quite apparent that its condition at the time it fell was the result of a slow process of deterioration extending over quite a long period of years. A soda fountain was against the west wall of the front portion of the American Confectionery, which had been there for ten or more years when the wall fell, and it is a fair inference that water from this fountain and from the hydrant in the northeast corner of the Booker Drug Store had seeped into the wall.

[1, 2] The two findings of the jury which are pertinent to this appeal were their answers to special issue No. 6 and defendants' requested special issue No. 1, quoted above. The case was manifestly tried upon the theory that Mrs. Willcox was not liable for any defects in the wall other than those that existed at the time the tenancy began and of which at that time she or her agents either had actual knowledge or should have discovered by the use of ordinary care. We find nothing in the testimony to support a finding that there was any warranty or representation by defendants that the building was safe, and no covenant or agreement on their part to repair, except where they expressly undertook to do so under the quoted stipulation of the lease. Under the common law the doctrine of caveat emptor applies to the leasing of real estate. Under this doctrine, the tenant takes the property as he finds it, and assumes all risk incident to its actual condition. Defects open to observation he must discover at his peril. The only duty resting upon the landlord is to disclose latent defects actually known to him. Consequently the rule repeatedly announced is that, in the absence of warranty, deceit, or fraud, injuries resulting from latent defects in the demised premises of which the landlord had no actual knowledge at the time of the lease cannot form the basis of recovery in an action by the tenant. See 36 C. J. p. 208, § 878; 16 R. C. L. 779; 18 A. & E. Ency. of Law (2d Ed.) p. 215; Lavery v. Brigance (Okl. Sup.) 242 P. 239, and cases cited.

We are not aware that the exact point here in question has been adjudicated in this state, but the common-law rule has been repeatedly announced with approval. See Perez v. Rabaud, 76 Tex. 193, 13 S. W. 177, 7 L. R. A. 620; O'Connor v. Andrews, 81 Tex. 33, 16 S. W. 628; Ross v. Haner (Tex. Civ. App.) 244 S. W. 235.

Under the rule in Tennessee the duty rests upon the landlord to make reasonable inspection of the demised premises and holds him liable for his failure to do so. Hines v. Willcox, 96 Tenn. 148, 33 S. W. 914, 34 L. R. A. 824, 832, 54 Am. St. Rep. 823; Edington v. Shoe Co. (Tenn.) 283 S. W. 987.

The author of the note in 34 L. R. A. 824, says:

"Hines v. Willcox is a new departure in the law of landlord and tenant. It places a duty on the landlord which it has not been the rule to place there, and to a large extent relieves the tenant from a duty which has always rested upon him."

The holding in Hines v. Willcox has been expressly disapproved in the following cases: Whitmore v. Paper Co., 91 Me. 297, 39 A. 1032, 40 L. R. A. 377, 64 Am. St. Rep. 229; O'Malley v. Associates, 178 Mass. 555, 60 N. E. 387; Shinkle v. Birney, 68 Ohio St. 328, 67 N. E. 715; Howard v. Water Co., 75 Wash. 255, 134 P. 930, 52 L. R. A. (N. S.) 578; Kutchera v. Graft, 191 Iowa, 1200, 184 N. W. 297, 26 A. L. R. 1257; Davis v. Manning, 98 Neb. 707, 154 N. W. 239; Anderson v. Robinson, 182 Ala. 615, 62 So. 512, 47 L. R. A. (N. S.) 330, Ann. Cas. 1915D, 829; Franklin v. Tracy, 117 Ky. 267, 77 S. W. 1113, 78 S. W. 1112, 25 Ky. Law Rep. 1409, 1909, 63 L. R. A. 649; Fraser v. Kruger (U. S. C. C. A., 8th Cir.) 298 F. 693.

In 36 C. J. pp. 220, 221, § 905, a doctrine in line with the Tennessee holding is announced. We have examined the cases there cited and find the only cases supporting the text, other than those from Tennessee, either (1) involve some local statute on the subject, (2) involve the rights of third parties (not the tenant or those claiming under him), or (3) relate to defects in the demised promises reserved for the common use of other tenants.

Under the common-law doctrine above announced, the jury finding in answer to defendants' first special issue negatives liability.

The trial court's judgment is reversed, and judgment is here rendered in favor of appellants.

Reversed and rendered.