[Civ. No. 1032. Fourth Appellate District.—July 18, 1934.]

MAYBELLE I. SCHELLENBERG et al., Respondents, v. SOUTHERN CALIFORNIA MUSIC COMPANY (a Corporation), Appellant.

Stearns, Luce & Forward and Harry P. Sweet for Appellant.

V. F. Bennett and Fred O'Farrell for Respondents.

BARNARD, P. J. — The plaintiff Maybelle I. Schellenberg, at about 6:15 P. M. on the night of January 2, 1931, while crossing C Street in the city of San Diego, at the intersection of that street with Thirteenth Street, sustained severe injuries through being struck by an automobile delivery truck owned by the defendant corporation and driven by the defendant Banks. In this action for damages which followed, the jury returned a verdict for $40,000, which was reduced to $30,000 in connection with a motion for a new trial. From the judgment then entered the corporation defendant alone has appealed.

The defendant Banks, who was nineteen years of age, had for some time been operating the delivery truck as an employee of the appellant. His work consisted in delivering radios, musical instruments and the like and in picking up and returning to the store articles on which payments were in default, when ordered to do so. He was assisted by one George Sorenson, who rode with him on the truck. In the usual course of business deliveries and pick-ups were made on written orders, the originals of which were placed on a hook in the store. Banks would take these orders to the truck and place them in a tin "book" and thereafter a record thereof would be made in a truck book carried on the truck, the entries usually being made by Sorenson while the truck was in motion. Banks had formerly been paid for extra work at night, but this practice was discontinued in November, 1930. While his regular working hours were from 8 A. M. to 6 P. M., Banks claimed to have done some work after 6 o'clock on some evenings after Christmas, 1930, although he was unable to remember when he so worked or what was done.

The appellant's store was on Broadway between Seventh Street and Eighth Street. At the close of each day's work the truck was taken by Banks to a garage on Eighth Street, immediately north of Broadway. Broadway runs east and west and C Street and F Street run parallel thereto, C Street being one block north and F Street two blocks south of Broadway. Thirteenth Street is six blocks east of Seventh Street and number 1441 F Street, which will hereafter be referred to, is between Fourteenth and Fifteenth Streets.

About 6 P. M. on January 2, 1931, Banks stopped at the garage where the truck was kept at night and Sorenson got out to get his own car for the purpose of proceeding to his home. They had previously had a conversation to the effect that there was nothing further for Sorenson to do. Banks drove the truck around the corner and stopped in front of the store. Sorenson, in his own car, drew up alongside the truck in front of the store. It was raining heavily at the time and appellant's manager and two or three of his assistants were standing in the entry-way to the store. Banks went into the store and immediately returned and got into the truck. It is not claimed that he received or

obtained any orders at that time. While Banks was present Sorenson called out to the group in the doorway and asked if there was anything further for him to do, and was told that there was not and motioned to go on. Appellant's manager then noticed that one of the lights on the truck was defective, whereupon he told Banks to take the truck to the garage and have it fixed, to which Banks replied "All right." Sorenson drove away and almost immediately Banks followed in the truck, turning north on Seventh Street. He turned east on C Street, but instead of then turning south on Eighth Street to go to the garage he proceeded east on C Street and as he crossed Thirteenth Street the accident in question happened.

After the accident Banks stated, on a number of occasions, that at the time the accident occurred he was on his way to pick up a radio either at 757 or 767 Seventeenth Street. He testified to this effect in the police court on January 20, 1931, and so told an investigator for appellant's insurance carrier as late as April 19, 1931. On the truck report for January 3d, the day after the accident, there appeared for the first time an entry purporting to be that of an order for a pick-up from 767 Seventeenth Street, which again appeared on January 5th, 6th, 7th and 9th. It was established that there was no such address and that no order for such an address was ever found. Sorenson testified that Banks gave him this number and that on each of these occasions Banks went up to a house and returned telling him that no one was at home. It was also established that the person living at 757 Seventeenth Street had had no dealings whatsoever with the appellant. As testified to by them, none of Banks' superiors knew of any order or of any work which Banks could have been executing for the appellant after 6 o'clock on the night of January 2d.

In an effort to check on the order relating to 757 or 767 Seventeenth Street, which Banks claimed to have been executing, Banks was taken to the store late in April to look over the carbon copies of the original orders which had been issued. While looking over these carbon copies Banks came upon the carbon copy of an order, dated December 31, 1930, to pick up a radio at the home of Simon Cervantes at 1441 F Street. He then stated that he thought this was the order

he was executing at the time of the accident, but he could not be positive because he did not have the original. He was asked to search for the original, but could not find it and the same was never found. Up to this time Banks had never mentioned the name of Simon Cervantes as the person to whose home he was going for the purpose of picking up a radio on the night of January 2d. At the time of the trial, he was very certain that this was the order he was executing at the time of the accident and was also certain that he had always remembered that the name was Cervantes although he might have been confused as to the address. The truck book contained no record of any order relating to Cervantes or 1441 F Street. At the time of the trial Banks 'claimed that he had had the Cervantes order for several days prior to January 2d, that the order was marked "rush", and that some time during the day of January 2d one of his superiors had told him to be sure to execute it. While he went to a supposed address on Seventeenth Street on January 3d, and several times thereafter, for the ostensible purpose of picking up a radio, and while he had Sorenson make records of such trips in the truck book, he did not go to 1441 F Street then or at any other time. When asked why he did not go he testified: "To the best of my memory I think it was because somebody down in the store said it was canceled." Sorenson testified that he knew of no further work for Banks to do that night and that when they separated Banks said nothing to him of having any other work to do. Banks' superiors testified that he had said nothing to them about any further work that night and that they knew of none. Banks testified that when he went back to the store at 6 P. M. on January 2d no one there told him to go out and pick up this radio. He further testified that he told neither Sorenson nor his superiors that he intended to make another trip. It is in evidence that the number of orders handled by Banks on January 2d was very small in comparison with that of the ordinary day. While Banks testified that sometimes one order took an unusual length of time because of the time required to put up aerials and the like, he did not testify as to any extra work in connection with the orders handled by him on that day. The evidence justifies the inference that the amount of work done by him on that day was

unusually small and that he had ample time during the day to execute another order if he had one.

All of the evidence introduced by the appellant went to the question as to whether Banks, at the time of the accident, was driving the truck with the consent of his employer and in the course of his employment. This was the entire defense and no effort was made to show that Banks was free from negligence at the time of the accident. The appellant now concedes that there is some evidence to support the judgment, if the testimony of Banks was believed by the jury, but contends that he was so thoroughly impeached by his own contradictory statements and by other evidence that his testimony is unworthy of belief, and that, at best, the evidence upon the main question of fact presented is so close that certain errors and misconduct must be held to have been prejudicial.

The first of these matters relates to certain instructions given. The court instructed the jury as follows:

"It is admitted that the plaintiffs are husband and wife; that defendant Banks was an employee of defendant Southern California Music Company; that defendant Banks was driving the automobile truck with the consent of the defendant Southern California Music Company at the time and place of the accident. These are to be considered by you as facts without proof or evidence."

Following this the court gave another instruction as follows:

"While the truck was being driven by defendant Banks with the consent of the defendant Southern California Music Company, a corporation, as its employee, it is presumed that he was so driving within the scope of his employment at the time and place of the accident and injuries."

It is conceded by the respondents, as it must be, that there was no admission in the pleadings that Banks was driving the automobile truck with the consent of the appellant at the time and place of the accident. Nowhere in the evidence is such a fact expressly admitted. It seems to be the respondents' contention that since it was shown that Banks drove the automobile during the daytime with the consent of the appellant, it conclusively follows that he was driving with such consent at the time of the accident

in question. It is also argued that since Banks was told to take the truck to the garage and have the lights fixed it follows that appellant's manager expected him to again make a trip for the company that night. This does not follow as the truck was to be used the next day and at that time of the year, especially in rainy weather, lights would be needed for the next day's work before 6 o'clock. While the respondents attempt to draw a distinction between driving with the consent of an employer and driving in the course of one's employment, under the facts as developed in this case this distinction is not important. No question was raised during the trial as to the possibility that the appellant had given Banks permission to use the truck upon business of his own or for his own purposes and, under the facts shown, it conclusively appears that if Banks was driving the truck at the time and place of the accident with the consent of his employer, he was driving the same in the course of his employment. The two matters were inseparable in so far as this case is concerned. Under these circumstances, the instruction complained of was not only an instruction upon a matter of fact, invading the province of the jury, but it was also directly contrary to the facts as shown by the evidence. While the court, in another instruction, purported to leave to the jury the question as to whether it had been shown by a preponderance of the evidence that the driver of the truck was acting within the scope of his employment at the time and place of the accident, this instruction was merely conflicting at best. And the jury had already been instructed that it was admitted, and was to be taken as an established fact without any proof or evidence, that Banks was driving the truck with the consent of his employer at the very time and place of the accident, and that it was to be further presumed from this that he was then driving within the scope of his employment. Not only was the jury thus instructed when a large part of the evidence was directly contrary to such an admission, as well as to such a fact, but the matter of such consent, under the circumstances, was so interwoven with the matter of the scope of the employment as to give the instruction upon the one an improper effect upon the other. We regard the question of fact before the jury as a close one, and it is not possible to say that the error was not prejudicial in the extreme.

■ Error is claimed in the refusal to give certain other instructions. One of these was to the effect that the fact that the defendant Banks was operating an automobile truck belonging to his employer at the time and place in question did not render his employer liable for his negligence unless it was further established, by a preponderance of the evidence, that the operation of the automobile at the very time and place of the accident was with the consent, directly or indirectly given, of his employer. Some such instruction should have been given in place of the instructions first above referred to.

The appellant complains of certain other instructions which were given. The matters referred to are not particularly prejudicial and appear to have been the result of an oversight. They will undoubtedly be corrected on another trial and further comment is unnecessary.

It is further contended that counsel for respondents were guilty of prejudicial misconduct in improperly indicating to the jury that the appellant was covered by insurance. The record contains a large number of instances where counsel laid themselves open to this charge. While some of the intimations to this effect are close to the line, and while some of them arose somewhat incidentally to other matters, it hardly seems possible either that the jury missed the force of the suggestions thus made or that the many matters of that nature occurring throughout the trial were entirely unintentional and accidental. The record is voluminous and it would serve no useful purpose to refer to all of the matters in detail. In examining prospective jurors, counsel for respondents asked a juror if he owned any stock in the Individual Underwriting Corporation and if he happened to be interested or engaged in selling accident insurance. The juror was then asked: "Do you happen to know a Mr. LeBarron or a Mr. Don or Von Heeringen, associated with insurance companies?" Counsel thus told the jurors that these gentlemen were associated with insurance companies, although no evidence to that effect was produced. The name of Mr. LeBarron was very frequently brought into the case thereafter. While he was present in the courtroom he did not take the witness-stand. While the next juror was being asked as to whether he represented an insurance company, appellant's counsel objected and the

court stated he would ask the matter of the jurors collectively. Counsel for respondents then stated: "I would prefer, if your Honor will permit me, to ask the question individually. I would like to get the individual juror's response to the question." The court, however, proceeded to ask the question of the jurors collectively and when he asked them whether they represented or had any stock in a named automobile indemnity exchange or whether they knew any of its officers or agents, counsel for respondents interrupted, suggesting the names of Mr. LeBarron and Mr. Von Heeringen, whereupon the court added to his question the following: "Mr. LeBarron or Mr. Von Heeringen, their representatives?" An objection to the question as it related to the two individuals was not sustained. Similar questions were asked of the other jurors and in one case counsel for respondents asked one of the jurors if he had ever acted as adjuster for any insurance carrier. During the taking of testimony counsel repeatedly asked witnesses if they knew Mr. LeBarron or if they had conversed with him, and similar questions. While one witness was testifying concerning the truck reports in possession of the appellant, counsel asked if he had seen Mr. LeBarron going through these reports. When another witness mentioned Mr. LeBarron counsel asked, "Who is Mr. LeBarron?" Another witness, who was known to counsel for respondents as an investigator for the insurance company, was asked by whom he was employed at the time of the investigation, bringing out the answer that he was employed by Mr. LeBarron. He was then asked if Mr. LeBarron had not left the courtroom and talked to witnesses in the corridor on several occasions. Another investigator for the insurance company was asked what was his business and for whom he worked. When he replied he worked for Mr. LeBarron he was asked if Mr. LeBarron was employed by the Southern California Music Company. When he replied that Mr. LeBarron did some work for this company he was asked: "And he wasn't employed by them as an employee in connection with their store, was he?" In his argument to the jury counsel for respondents stated, in connection with a certain matter, that Mr. LeBarron knew certain facts, there being nothing in the record justifying this statement or justifying the reference to Mr. LeBarron.

■ While it has been held proper to interrogate prospective jurors as to their ownership of stock or interest in an insurance company to the end that an unprejudiced jury may be secured, it is equally well settled that jurors may not be in effect told that a defendant is insured and that any judgment that may be rendered will be paid by the insurance company. It has also been held that any information of such a fact which comes out incidentally in connection with something which is proper for the plaintiff to bring out and without an intention on the part of the plaintiff to violate the rights of the defendant, is not a sufficient cause for reversal. In general, under the authorities, the rule obtains that the question of prejudicial misconduct in such a connection comes down to a question of good faith on the part of counsel. It is strenuously urged by counsel for respondents that the record shows that they are within this rule and that any reference to or suggestion of an insurance company in this case came up accidentally, and that there is nothing to show a lack of good faith upon their part. Counsel for respondents devote 127 pages of their brief to justifying their actions in this respect, and while it may be conceded that a part of the instances referred to find some justification under some of the authorities, it is suggestive that many instances require explanation, that so many are close to the border line, and that several were injected unnecessarily.

■ It is further argued by respondents that the appellant waived any objection to these matters by failing to ask for a mistrial before the taking of evidence was begun. It is pointed out that after the jury was selected, but before the trial commenced, in the absence of the jury, the court asked counsel for the appellant if he intended to take advantage of any error in this regard. Counsel for appellant replied that he thought he would. The court stated that he did not know as to the fact, but that if it were a fact that Mr. LeBarron and Mr. Van Heeringen were not associated with an insurance company he would declare a mistrial. Upon being assured by counsel for the respondents that these gentlemen in fact represented an insurance company, the court stated that they would proceed. Under these circumstances and especially when many of the incidents referred to occurred during the taking of the testimony and

during the argument, it cannot be held that the matter was waived by the appellant.

In our opinion, the rule that a plaintiff must not be allowed to inform a jury that a possible judgment is to be paid by an insurance company should not be further relaxed. In this regard, the case before us goes further than any case to which our attention has been called or of which we have knowledge, with the exception of those cases where the jury was told this fact in express terms. In our opinion, the record on this matter justifies a reversal for the following reasons: 1. It was repeatedly, although by indirection, brought to the attention of the jury that an insurance company was interested in the outcome and it is unreasonable to believe that the jury failed to comprehend the situation. 2. The inference seems to be clear that a part, if not all, of the matters referred to were brought out for the purpose of informing the jury of the fact that the appellant was insured. 3. The court did not instruct the jury to disregard any of these matters, but apparently took the position that if any of the investigators or witnesses in fact represented an insurance company the truth of the fact was a sufficient justification. 4. The main question of fact presented to the jury was a close one and it is impossible to say what the result would have been in the absence of this objectionable matter. 5. It seems probable that the matter under consideration had its effect upon the amount of the verdict. Assuming that the verdict could not be held excessive, in itself, as a matter of law, it was undoubtedly very liberal, even if full consideration be given to all injuries sustained. The respondents, for another purpose, set forth the statement made by the trial judge in ruling on a motion for a new trial. After referring to the matter of insurance which he said had crept into the case, he said: ''I do feel it may have had some effect on the amount of the verdict, and, therefore, I feel impelled to arrive at the amount of the verdict in my own way, independent of the jury's verdict.'' As a result the verdict was reduced from $40,000 to $30,000. While the statement of the trial judge is not a part of the record, a reading of the record leads us to the same conclusion. If knowledge that an insurance company was interested in the result had an effect upon the amount of the verdict, it is

hardly possible to say that this information was without an effect upon the entire verdict.

For both of the reasons mainly relied on by the appellant, there should be a new trial to the end that the question as to the responsibility of the appellant for the negligence of its co-defendant should be determined upon its merits.

The judgment is reversed.

Jennings, J., concurred.

Marks, J., being absent, did not participate in this opinion.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 13, 1934.