[Civ. No. 14641. First Dist., Div. One. June 25, 1951.]

RALPH CRAWFORD, Respondent, v. NUNCIO ALIOTO, Appellant.

46

Charles V. Barfield and Joseph L. Alioto for Appellant.

Robert E. Hatch and Benjamin C. Mickle for Respondent.

WOOD (Fred B.), J.—Defendant Nuncio Alioto appeals from the judgment entered upon a verdict for plaintiff and from an order granting a new trial upon the issue of damages alone, in an action for personal injuries.

The accident occurred in the morning of March 6, 1948, at the intersection of Fillmore and Bay Streets and Cervantes Boulevard in San Francisco. Fillmore Street runs north and south, Bay extends easterly from the east side of Fillmore; Cervantes extends northwesterly from the west side of Fillmore, its southwesterly line connecting with the west line of Fillmore at a point nearly due west of the north line of Bay extended. The day was clear and sunny, the streets dry, and visibility excellent. Respondent testified that, with his dog, he walked north on the sidewalk along the east side of Fillmore to the curb at the intersection with Bay, stopped and looked for approaching traffic, saw two vehicles on Cervantes, the nearest about 15 or 20 feet from the stop sign at Cervantes and Fillmore; that he waited for his dog, again looked for approaching traffic and then started northerly across Bay

Street in the center of the marked pedestrian crosswalk; that he took several steps, and then his next recollection was when he awoke in a hospital several days later. Elmer Brunette, who operated a service station at the northeast corner of Fillmore and Bay Streets, testified that respondent came to his station two times after the accident; that, the second time, respondent said he was dragged in the crosswalk and Brunette said to him, "Crosswalk, you weren't in the crosswalk," and that respondent said, "Well, he [respondent] didn't know, he was unconscious for—I don't know how long."

Appellant testified that he drove his truck southeast on Cervantes Boulevard and stopped at the intersection of Cervantes and Fillmore. He saw respondent and a dog standing on the sidewalk on the south side of Bay, east of Fillmore, about 25 to 30 feet east of the east line of the north-south pedestrian crossing at Bay and Fillmore. Appellant crossed Fillmore and was traveling along Bay at about 15 miles an hour; when he was 20 to 25 feet east of the crosswalk, the dog ran from the sidewalk into Bay Street and respondent ran after the dog; the dog was 3 or 4 feet ahead of respondent, and respondent ran into the right front fender of appellant's truck. Appellant said he applied his brakes when respondent and the dog ran into the street, and his truck stopped within 9 or 10 feet and about 1 foot beyond the point of impact; that he saw the respondent from the time appellant stopped at the intersection up to the time of the impact; that he did not swerve his truck nor sound his horn; that he had no time to sound the horn; that he had time only to apply the brakes. Irving Brown, a parcel postman, who arrived on the scene soon after the accident, testified that he asked appellant "How did it happen?" and appellant replied, "I don't know. I didn't see the old gentleman," referring to respondent. A police officer who arrived after the accident testified that he asked appellant how the accident occurred and appellant told him, "As he [appellant] crossed the street, the glare of the sun hit his windshield and he was right on top of the man before he saw him." Appellant denied that he made either of those statements. Brunette testified he was in appellant's presence at all times after the accident that morning, and did not hear appellant make any such statements; but admitted, on cross-examination, that he did not hear all conversations.

Brunette testified he first saw the truck at the stop sign at Cervantes and Fillmore; that he saw respondent and a dog

standing on the sidewalk on the south side of Bay Street, about 20 to 25 feet east of the crosswalk at Bay and Fillmore. He and his wife, Lois, both testified that they saw respondent and the dog run from the sidewalk into the street; saw them running into the street until the truck obscured the vision of the witnesses, at which time appellant's truck was traveling at 10 to 15 miles an hour, and the truck stopped in about 8 to 10 feet. They also testified that it was a common occurrence to see respondent and his dog running across the street. The police officer testified that he asked Brunette if he saw the accident and he said "No." Ben Mickle, one of respondent's attorneys, testified that when he was investigating the accident Mrs. Brunette told him she did not see the accident, and that her attention was called to it by a loud crash. She testified that he did not ask her if she knew anything about the accident and that she did not volunteer anything about it. Mickle also testified that Elmer Brunette told him that he saw respondent and the dog standing on an inspection plate at the southeast corner of Fillmore and Bay (which would place respondent between 6 and 12 feet east of the crosswalk, instead of the 20 to 25 feet stated by Brunette at the trial) and that Brunette told Mickle he did not see respondent and the dog leave the curb. A statement in evidence, written by Mickle and signed by Brunette, was consistent with this testimony of Mickle which tended to impeach Brunette. Upon cross-examination, concerning his financial interest in the outcome of the action, Mickle testified that he had a written contingent fee contract with respondent and that his interest was one-sixth of the amount that might be recovered.

The police officer and the ambulance driver each testified that when he arrived the front end of the truck was 25 to 30 feet east of the pedestrian lane; the ambulance driver, that the truck was 12 to 15 feet from the sidewalk on the south side of Bay Street. Appellant had backed the truck about a foot from the point where the truck stopped, to release respondent's shoe, upon which the right front tire was impinging.

It appeared without conflict that respondent sustained severe injuries,—a skull fracture, a compound fracture of the right elbow, dislocated collarbone, a compound fracture of the left knee, and several fractures in the pelvic area. He was hospitalized for nine weeks. Then, on advice of his doctor, he took a trip south for the warmer climate. He had a second operation for removal of bony pieces around the elbow joint. His condition is now stationary. No substantial improvement

in the future is anticipated. He has 50 per cent impairment of movement in his right elbow joint; pains and aches in the lower part of the back and in the pelvic area; some instability in his left knee; and about a 20 degree restriction of elevation of his right arm. His surgical, nursing and hospital expenses amounted to $4,181; the trip south cost $680.

Respondent had worked for the same firm for 30 years, selling industrial, mining and construction equipment, which entailed extensive traveling and the examination of the properties and plants of prospective buyers. His compensation was about $10,000 a year, plus traveling expenses. His employer had planned to send him to Manila to attend to its business in the Philippine Islands. He was to receive $10,000 a year, his living expenses at Manila, and his traveling expenses when away from Manila. He will never be able to carry on the duties of the work such as he had been doing previously. He has not been engaged in any business activity since the accident except to go down to the office occasionally. His employer has been paying him $300 a month from the time of the accident to the time of the trial, but is not obligated to do so. In his present condition he does not know of any job his employer has that he could do. The court instructed the jury that respondent has an expectancy of 14 more years but that the jury may consider the evidence of his physical condition, his habits of life, his health, and such things as would or might reduce it to less than 14 years.

The jury gave its verdict in favor of respondent in the sum of $60,000. Appellant moved for a new trial upon all grounds. The court granted the motion "as to damages only, on grounds of insufficient evidence."

Appellant, in support of his claim that the new trial should be upon all issues, assigns as error: (1) The failure of the court to give his proposed cautionary instruction concerning oral admissions of a party, (2) curtailment of his cross-examination of one of respondent's witnesses, and (3) asserted misconduct of respondent's counsel in suggesting to the jury that appellant was insured.

It is settled, of course, that there is to be a new trial, respondent not having appealed from the order for a new trial on the issue of damages. The basis for a limitation of the issues upon new trial is difficult to understand. All the conflicts in the evidence bear upon the issue of liability; none, upon the issue of damages. And the evidence on the latter issue would appear to support the amount awarded.

█ The cautionary instruction which appellant requested and the court refused, read as follows: "You are instructed that evidence of the alleged oral admission of a party, other than his own testimony in the trial, ought to be viewed by you with caution." This was a proper instruction and should have been given. It was substantially in the language of section 2061 of the Code of Civil Procedure, which declares that the jury are "to be instructed by the court on all proper occasions" that "the evidence of the oral admission of a party" ought to be viewed "with caution." The out-of-court statements of the appellant to which we have referred were not admissible merely and solely for the impeachment of appellant as a witness. He was also a party. █ "A declaration by a litigant contrary to his position in the lawsuit is admissible under an exception to the hearsay rule as an admission. It is positive evidence, that is to say, it is evidence which tends to prove the truth of the matter admitted." (*Bonebrake* v. *McCormick,* 35 Cal.2d 16, at 18-19 [215 P.2d 728].) The reasons for the requirement of a cautionary instruction in respect to oral admissions of a party were clearly and cogently stated by our Supreme Court in *People* v. *Bemis,* 33 Cal.2d 395, at 398-99 [202 P.2d 82], as follows: "The dangers inherent in the use of such evidence are well recognized by courts and text writers. (*People* v. *Thomas,* 25 Cal.2d 880, 890 [156 P.2d 7]; *People* v. *Koenig,* 29 Cal.2d 87, 94 [173 P.2d 1]; *People* v. *Cornett, ante* [33 Cal.2d ], p. 33 [198 P.2d 877]; *People* v. *Wardrip,* 141 Cal. 229, 232 [74 P. 744]; *Kauffman* v. *Maier,* 94 Cal. 269, 283 [29 P. 481, 18 L.R.A. 124]; *Conger* v. *White,* 69 Cal.App.2d 28, 38 [158 P.2d 415]; *Damas* v. *People,* 62 Colo. 418, 421 [163 P. 289, L.R.A. 1917D 591]; *Thomas* v. *State,* 186 Md. 446, 452 [47 A.2d 43, 167 A.L.R. 390]; *Sylvain* v. *Page,* 84 Mont. 424, 438 [276 P. 16, 63 A.L.R. 528]; *Kutchera* v. *Graft,* 191 Iowa 1200, 1206 [184 N.W. 297, 26 A.L.R. 1257]; *Commonwealth* v. *Giovanetti,* 341 Pa. 345, 362 [19 A.2d 119]; *Collins* v. *Commonwealth,* 123 Va. 815, 821 [96 S.E. 826]; 3 Wigmore on Evidence, § 866; 7 Wigmore on Evidence, §§ 2070, 2071, 2094; 2 Wharton, Criminal Evidence, § 643.) 'It is a familiar rule that verbal admissions should be received with *caution* and subjected to careful scrutiny, as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission, and are liable, by the omission or the changing of words, to convey a false impression of the language used. No other class of testimony affords such tempta-

tions or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself.' (2 Jones, Commentaries on the Law of Evidence, 620.) It was undoubtedly such considerations that led the Legislature to make the admitting of extrajudicial admissions into evidence conditional on the giving of a cautionary instruction. (See *People* v. *Dail,* 22 Cal.2d 642, 655 [140 P.2d 828].) Section 2061 of the Code of Civil Procedure provides that the jury are 'to be instructed by the court on all proper occasions: 4. That the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of a party with caution,' and it is now settled that it is error for the trial court not to give such instructions in proper cases. (*People* v. *Koenig, supra,* 29 Cal. 2d 87, 94; *People* v. *Cornett, supra, ante* [33 Cal.2d], p. 33 [198 P.2d 877] ; *People* v. *Hamilton, ante* [33 Cal.2d], p. 45 [198 P.2d 873] ; see *People* v. *Dail, supra,* 22 Cal.2d 642, 656; *People* v. *Macias,* 77 Cal.App.2d 71, 80 [174 P.2d 895].) ''

The Bemis case, a criminal case, enunciates a principle that is of general application, one that obtains also in civil cases. (See authorities cited in the Bemis case, and *Freeman* v. *Nickerson,* 77 Cal.App.2d 40, 62 [174 P.2d 688].)

Respondent contends that the failure to give the instruction was not prejudicial, for the asserted reason that its only application was to the testimony of the postman and the police officer who were completely disinterested in the outcome and never heard of either of the parties before or after the accident, to weigh whose credibility no juror needed a pedantic dissertation; that such testimony was not even primary evidence and was but cumulative of what respondent proved by physical and other undisputed evidence; hence, that the omission of this instruction could not have had more than the slightest effect on the jury in this case.

We do not so view it. This testimony put into evidence two out-of-court statements of the appellant that bore upon the issue of liability as well as appellant's credibility as a witness, in a case in which the testimonial evidence was sharply conflicting and closely balanced. The physical evidence to which respondent refers does not impress us as having the quality of indisputability which he would accord it. The accuracy of the postman and the police officer in observing, remembering, and relating what they heard, was for the jury to determine under proper instructions, includ-

ing this cautionary instruction. The jury had a difficult task in determining which version to accept of what appellant said at the scene of the accident, and what weight to give it. Respondent had the burden of proof on the issue of appellant's liability. In determining whether respondent had met that burden, the jury should have had before it the cautionary instruction required by the statute. We cannot say that a different verdict would have been improbable had the instruction been given. ■ We conclude, therefore, that the failure to give it was prejudicial and that the cause should be retried on all issues. ■ "A limited new trial should not be granted, where substantial justice requires that a new trial, if granted at all, should cover all of the issues." (*Shurman* v. *Fresno Ice Rink*, 91 Cal.App.2d 469, 477 [205 P.2d 77], citing *Keogh* v. *Maulding*, 52 Cal.App.2d 17 [125 P.2d 858].)

■ In respect to the asserted curtailment of appellant's cross-examination of the witness Mickle, we find no error. In response to appellant's questions, the witness said he was one of the attorneys for respondent and that as attorney he had a written contract with respondent. Appellant demanded production of the contract. The court sustained respondent's objection thereto as collateral to the issues in the case. In response to further questions, Mickle said he had a financial interest in the case, a contingent fee, one-sixth of the amount recovered, and that he had paid court costs and jury fees. Appellant again demanded the contract and the court again sustained an objection thereto upon like grounds as before. The court was within its province and entirely correct in so ruling.

The suggestion to the jury that appellant was insured was first made during the cross-examination of respondent's witness Brown. The witness had testified that he was interviewed at his home by respondent's attorney Mickle one or two days after the accident. Appellant's attorney asked him, "Then Mr. Mickle just came to see you out of a clear sky?" and the witness answered, "Yes, both sides came to see me, also from the insurance company." Appellant immediately assigned this as prejudicial misconduct and asked for a mistrial. The court ruled, "I will ask the jury to disregard it, and there is no evidence of any kind or character."

Later, upon rebuttal, Mickle, testifying relative to his interviews with Brunette, volunteered the fact that one Sehorn was also interviewing Brunette, as indicated by the following questions and answers: "MR. HATCH [attorney for respondent]: Q. Then on that day, the same day, did you discuss

with Mr. Brunette what he knew about it? A. [witness Mickle] I saw Mr. Brunette three or four times, and frankly my recollection is not clear as to what the first time was. I have a definite recollection that on one occasion, about a quarter of 9:00 on the following Monday morning, which would have been about two days later—— Q. Two days after the accident, you mean? A. Yes. There was another person there looking for witnesses to the accident, a fellow by the name of Sehorn, and so Mr. Brunette was busy with his cars and Mr. Sehorn and I both were looking for a statement, or at least an oral statement of his version of the accident and he didn't seem to want to talk to either of us at the time, so we wandered off to Montgomery Street and had coffee together—— Q. That is, you and Mr. Sehorn? A. Yes. . . ." Upon cross-examination, Mickle again referred to Sehorn, without mentioning him by name: "MR. BARFIELD [attorney for appellant] : Q. How many calls did you make on Mr. Brunette? A. There are three that are definitely in my mind. One, when your man was there—— MR. BARFIELD: Now, if the Court please, may that be stricken? I have no man that was there. Your Honor, could that be stricken out? THE COURT: All right, it may go out. A. When the man investigating for the defendant was there—— MR. BARFIELD : May that be stricken, your Honor? How does he know?"

As his last witness upon rebuttal, respondent recalled appellant under section 2055 of the Code of Civil Procedure and interrogated him concerning Sehorn's investigational activities: "MR. HATCH: Q. Mr. Alioto, did you have somebody in your behalf interview the Brunettes within the day or two after the accident? MR. BARFIELD: That is objected to as not within the issues of the case. THE COURT: Overruled. MR. HATCH: The court says you may answer that. A. No. MR. HATCH: Q. You don't know Mr. Sehorn? A. I know of him, yes. Q. I am not going to ask you who he is or that, I just want to know when Mr. Sehorn was investigating this accident, was he doing it on your behalf? A. No. Q. Has he ever been your attorney? A. No. Q. And he is not connected with Mr. Barfield's law office? MR. BARFIELD: Not of my office. MR. HATCH: Q. He is not any member of the law office, put it that way. A. I don't know."

Appellant represents that in view of these episodes a jury would enter upon its deliberations convinced that appellant was insured and that for all practical purposes a verdict

against appellant would be a verdict against an insurance company.

Respondent claims that Brown's mention of "the insurance company" was but the spontaneous reaction of a witness undergoing rigorous cross-examination and is not chargeable to the respondent; and that appellant did not ask the court to instruct the jury but that the court did do so, and at the close of the trial gave a formal instruction to disregard that testimony of Brown. Appellant did, however, assign that volunteer statement as prejudicial misconduct and asked for a mistrial, which the court denied, admonishing the jury to disregard the statement. Respondent invokes *Packard* v. *Moore,* 9 Cal.2d 571, 580 [71 P.2d 922], and *Gluckstein* v. *Lipsett,* 93 Cal.App. 2d 391, 404 [209 P.2d 98], in which the courts announced and applied the rule that " 'While courts have condemned repeatedly attempts to bring before a jury the fact that insurance exists, their condemnation extends only to cases where there is an "avowed purpose and successful attempt" to bring the fact before the jury. It does not extend to cases where the information comes in, incidentally, in attempting to prove other facts, or where the record does not show that the particular answer was sought or anticipated.' " (Quoting from *Hughes* v. *Quackenbush,* 1 Cal.App.2d 349, 358 [37 P.2d 99].)

If the witness Brown's statement stood alone in this case, there might be some similarity to the situation which obtained in the Packard and Gluckstein cases. ▮ But the subsequent repeated references to Sehorn and his identity, in the testimony of Mickle and the questions asked of Alioto, are indicative of a purpose and a successful attempt of respondent to bring to the attention of the jury the fact that insurance exists. They presented the picture of a person interested in the case to the extent of interviewing a witness and obtaining a statement from him, a person who represented some person or agency other than the appellant or the respondent, inferably an insurance company. That testimony and those questions, respondent urges, represented merely a legitimate attempt to show that Brunette's testimony was untrue; i. e., Brunette said he gave another written statement, apparently in the possession of appellant or his attorney, which if the same as that given Mickle would substantiate Mickle's impeachment of Brunette. Such a purpose, if it existed, was but collateral to a collateral matter and did not bear upon any issue in the case. Sehorn's identity (whether he represented respondent, or whom) and his activities, had nothing to do

with the accident or the circumstances of its occurrence. Such conduct upon the part of respondent is of the kind condemned in *Squires* v. *Riffe*, 211 Cal. 370, 373-374 [295 P. 517]; *Citti* v. *Bava*, 204 Cal. 136, 138-139 [266 P. 954]; *Mahnkey* v. *Bolger*, 98 Cal.App.2d 628, 635-638 [220 P.2d 824]; *Sischo* v. *City of Los Banos*, 26 Cal.App.2d 642, 646-647 [80 P.2d 116, 1020]; and *Schellenberg* v. *Southern Cal. M. Co.*, 139 Cal.App. 777, 787 [35 P.2d 156]. It was error to allow, over appellant's objection, the questions asked of Alioto concerning the investigator Sehorn. As stated in the Squires case, " ' ". . . The natural tendency of a line of examination that suggests to the jury that the defendant is indemnified against any judgment for damages against him is highly prejudicial to his rights, especially in a closely balanced case where the evidence would be easily sufficient on appeal to support a verdict either for the plaintiff or for the defendant. . . ." ' " (211 Cal. at p. 374, quoting from *Citti* v. *Bava, supra,* 204 Cal. 136, 139.) The evidence in the instant case is closely balanced on the issue of liability. From an examination of the record in this case it is impossible for us to state that the jury would not have found a different verdict had the objectionable examination not taken place and the evidence not been admitted. In view of our holding that the failure to give the cautionary instruction was prejudicial, we do not find it necessary to decide whether the error in reference to the insurance evidence alone would be prejudicial and require a broadening of the new trial order.

The order granting a new trial is modified by providing that the new trial shall be upon all of the issues; as so modified, the order is affirmed. The appeal from the judgment is dismissed; appellant to recover costs on both appeals.

Peters, P. J., and Bray, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 23, 1951. Carter, J., voted for a hearing.