**Patricia Ann OSBORNE, as Personal Representative of the Estate of Gary Alan Osborne, Deceased, Appellant, Cross-Appellee,**

v.

**Randy RUSSELL, d/b/a Randy's Electric, Appellee, Cross-Appellant.**

Nos. 6823, 6867.

Supreme Court of Alaska.

Aug. 26, 1983.

Max N. Peabody, Shimek & Peabody, Anchorage, for appellant/cross-appellee.

Paul W. Waggoner, Anchorage, for appellee/cross-appellant.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

On March 22, 1980, Gary Alan Osborne was electrocuted while working as an assistant manager at a Church's Fried Chicken outlet in Anchorage. At the time of the accident, the decedent was apparently reaching into a floor safe when his forehead touched bare wires sticking out of an open electrical junction box located on the wall adjacent to, and immediately above, the safe. Patricia Ann Osborne, as personal representative of the estate of the decedent, filed suit against Randy Russell, d/b/a Randy's Electric, the electrician who had performed electrical work at the store, alleging negligence and seeking recovery of damages for decedent's wrongful death.

After trial, a jury returned a special verdict finding Russell not negligent. Osborne appeals the superior court's failure to instruct the jury on negligence per se and its failure to direct a verdict in her favor on the issue of negligence. She also contends the superior court erred in submitting certain instructions to the jury concerning superseding cause. Russell cross-appeals the superior court's instruction concerning the

measure of damages for the wrongful death of a person leaving no dependents.

The building in which the accident occurred was purchased by George Lamoureaux, the owner of several Church's outlets in Anchorage, approximately three months before the accident. Lamoureaux contracted with G. Robert Shower of Shower Construction to remodel the store and contracted with Russell to perform the electrical work necessitated by the remodeling. The store had previously been operated as a Pioneer Chicken outlet which used a gas system for cooking chicken. Lamoureaux wanted to change to an electrical cooking system and Russell was hired to hook this up, as well as to install outlets in a wall that Shower was to build.

Two to three weeks before the accident, Russell became aware that the wires which later caused Gary Osborne's death were not insulated on the ends, were sticking approximately four inches out of the wall through an open electrical junction box and were "hot." These wires were in a small office where Russell apparently had not been directed to perform electrical work. Russell was informed by Mr. Shower that a Shower employee received an electrical shock from the wires while working in their vicinity. To remedy the problem, Russell located the circuit leading to the exposed wires on the main circuit breaker panel, flipped the breaker switch to the "off" position and placed a piece of duct tape over the switch. Russell also tucked the protruding wires back into the open junction box, but he did not use electrical tape or plastic wire nuts to insulate their exposed ends. Russell testified that he placed duct tape over the breaker switch so that others would not re-energize the circuit, and also to serve as a "book mark" to remind him to insulate the exposed ends of the wires later on.

Russell continued to work sporadically on the premises, but he forgot about the exposed wires after taping the circuit breaker in the "off" position. The day preceding the accident, Russell was working on the circuit breaker panel and saw that all the breakers were in the "on" position. Someone had removed the duct tape and re-energized the exposed wires, but Russell's "book mark" was no longer there to remind him and he did not independently remember that he had intended to insulate the ends of the wires in the open junction box.

There is a dispute as to the occurrences on the morning of the accident. Lamoureaux claimed at trial that he called Russell at 8:00 a.m. and asked him to install an outlet for a calculator in the office where decedent was subsequently electrocuted. Presumably, this would have involved work on the open junction box containing the exposed wires. Russell testified that he was at Church's Chicken that day from 7:00 a.m. to 9:00 a.m., but denied that he was called there by Lamoureaux to install an outlet. He stated that he worked only in the front part of the store on that morning, hanging lights in the eating area. That same morning, Lamoureaux asked his handy man, Arnold Scheeler, to install an outlet for the calculator. Scheeler testified that he noticed exposed wires were protruding from the open junction box in the office, and that he touched the wires and discovered that they were "hot," whereupon he informed Lamoureaux of the dangerous situation. Scheeler stated that Lamoureaux then told him not to work on the outlet because an electrician was coming. Lamoureaux claimed that he expected Scheeler to fix the circuit right away. As a result of this confusion, the exposed wires remained energized and caused the death of Gary Osborne that afternoon.

### I

Prior to trial Osborne submitted a proposed jury instruction which stated that, under the law of Alaska,[1] a person performing electrical work on a commercial building must comply with the safety rules set forth in the 1978 National Electrical Code, and that if the jury found that Russell had violated those rules, the jury should find him negligent as a matter of law. In sup-

---

1. *See* AS 18.60.580 (amended 1981).

port of this instruction, Osborne presented expert testimony that Russell's failure to insulate the bare ends of the wires which electrocuted decedent after learning of their existence and knowing that they were connected to the circuit breaker panel violated two provisions of the 1978 National Electrical Code.[2] The superior court declined to give this instruction to the jury, and Osborne argues on appeal that the court thereby committed error.[3]

We have recently observed that in determining whether a negligence per se instruction is appropriate, the superior court should conduct a two-step inquiry.

First, it must decide whether the conduct at issue lies within the ambit of the statute or regulation in question, by applying the four criteria set out in the Restatement (Second) of Torts § 286 (1971).[4] This threshold determination is strictly a legal conclusion, and we will exercise our independent judgment in deciding whether the superior court interpreted the scope of the statute or regulation correctly.

Once it has concluded that the enactment applies to the allegedly negligent conduct, the superior court may exercise its discretion to refuse to give the negligence per se instruction. Such discretion is extremely limited, being confined to those "highly unusual cases" in which "laws may be so obscure, oblique or irra-

tional that they could not be said as a matter of law" to provide an adequate standard of due care, or to those where the enactment amounts to little more than a duplication of the common law tort duty to act reasonably under the circumstances. The superior court's disposition of the question of whether the enactment was too vague or arcane to be utilized as a reasonable standard of care will only be reversed on appeal if it constitutes an abuse of discretion.

*Harned v. Dura,* 665 P.2d 5, 12 (Alaska 1983) (citing *State Mechanical, Inc. v. Liquid Air, Inc.,* 665 P.2d 15, 18–19 (Alaska 1983); *Bailey v. Lenord,* 625 P.2d 849, 856 (Alaska 1981); *Northern Lights Motel, Inc. v. Sweaney,* 561 P.2d 1176, 1183 (Alaska 1977); *Bachner v. Rich,* 554 P.2d 430, 440–42 (Alaska 1976); *Ferrell v. Baxter,* 484 P.2d 250, 260 (Alaska 1971)).

■ The superior court declined to give Osborne's negligence per se instruction, apparently for the reason that the title preceding section 110–14(b) refers only to splices. Thus, it appears to have concluded in the first step of its inquiry that Russell's failure to insulate did not lie within the ambit of the section, since the exposed ends of the wires were eventually to have been connected to an electrical outlet without being spliced. Exercising our independent judgment, we hold that this was error, for section 110–14(b) plainly does cover "the

**2.** Those provisions are section 110–14(b) which states:

> *Splices.* Conductors shall be spliced or joined with splicing devices suitable for the use or by brazing, welding, or soldering with a fusible metal or alloy. Soldered splices shall first be so spliced or joined as to be mechanically and electrically secure without solder and then soldered. All splices and joints and *the free ends of conductors shall be covered with an insulation equivalent to that of the conductors or with an insulating device suitable for the purpose.* [Emphasis added].

and section 310–2 which states:

> *Conductors to be Insulated.* Conductors shall be insulated.

**3.** Osborne also argues that the superior court erred in refusing to direct a verdict in her favor on the issue of Russell's common law negli-

gence. We need not address this argument, however, since for the reasons stated below we are persuaded by her argument that the court erred in failing to direct a verdict in her favor on the issue of Russell's negligence per se.

**4.** Section 286 of the Restatement (Second) of Torts (1971) provides:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the type of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

free ends of conductors," as does section 310–2.[5] It would not be sensible to limit these sections to only spliced and energized wires connected to closed circuits, since their purpose is to protect persons from exactly the sort of accident which occurred in this case. *See Ferriss v. Texaco, Inc.,* 599 P.2d 161, 163 (Alaska 1979) (stating that the purpose of the National Electrical Code is to protect the safety of persons who might be injured by electricity.) The exposed end of any wire connected to a circuit breaker receiving electricity is capable of immediately becoming deadly—only the inadvertent flip of a switch is necessary to re-energize the wires and permit electrocution.

█ It is also possible that the superior court rejected Osborne's negligence per se instruction based on the second step of its inquiry; that is to say, it is possible that the court concluded that the provisions of the Code cited by Osborne were "too vague or arcane" to be used as a standard of care. The record contains deliberative statements by the court to this effect. However, if that were the case we would nonetheless conclude that the court had erred, since the provisions in question are not obscure, or oblique or irrational, and they are not merely a reiteration of the general command to act reasonably. Rather, these provisions convey specific commands that wires be insulated, and they are directed expressly to professional electricians such as Russell.

---

**5.** In *State Mechanical, Inc. v. Liquid Air,* 665 P.2d 15, 20 (Alaska 1983), we likewise held that a title to a subsection of a safety code was not controlling as to the scope of its coverage. We rejected the appellant's argument that the last sentence of General Safety Code § 01.-1002(a)(2)(B)(ii), which states that "[c]ylinders shall not be kept in unventilated enclosures such as lockers and cupboards," did not apply to cylinders being used on construction sites since that provision is preceded by the title *"Inside of buildings."*

**6.** Restatement (Second) of Torts § 288A (1965) provides:
(1) An excused violation of a legislative enactment or an administrative regulation is not negligence.
(2) Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when

*Compare Ferriss v. Texaco, Inc.,* 599 P.2d at 164. We believe, therefore, that under these circumstances there was no area of discretion in which the court could act. The court erred in refusing to give a negligence per se instruction.

█ That being the case, we further hold that the superior court erred in failing to grant Osborne's motion for a directed verdict as to negligence. Viewing the evidence in the light most favorable to Russell, we find that reasonable persons could not have differed as to whether Russell had complied with the terms of the National Electrical Code as we have construed them. *See Johnson v. State,* 636 P.2d 47, 51 (Alaska 1981); *Rutherford v. State,* 605 P.2d 16, 18 (Alaska 1979). Russell frankly admitted that he failed to insulate the exposed ends of the wires. Likewise, the record presents no question of any excuse for Russell's noncompliance.[6]

## II

█ Negligent conduct may be found to be the "legal cause" of harm if the negligent act or omission "was more likely than not a substantial factor in bringing about [the] injury," *Sharp v. Fairbanks North Star Borough,* 569 P.2d 178, 181 (Alaska 1977) (quoting *City of Fairbanks v. Nesbett,* 432 P.2d 607, 610 (Alaska 1967)), and there is no rule of law relieving the actor from liability because of the manner in which his

(a) the violation is reasonable because of the actor's incapacity;
(b) he neither knows or should know of the occasion for compliance;
(c) he is unable after reasonable diligence or care to comply;
(d) he is confronted by an emergency not due to his own misconduct;
(e) compliance would involve a greater risk of harm to the actor or to others.
Section 288A was adopted by this court in *Ferrell v. Baxter,* 484 P.2d 250, 263 (Alaska 1971). Although he was apprised before trial that a negligence per se theory would be advanced, Russell failed to bring forth evidence to meet his burden of excusing his conduct pursuant to this section. *See Ferrell,* 484 P.2d at 257; *Nazareno v. Urie,* 638 P.2d 671, 676 (Alaska 1981).

negligence has resulted in the harm. Restatement (Second) of Torts § 431(b) (1965); *Morris v. Farley Enterprises, Inc.,* 661 P.2d 167, 169 (Alaska 1983). In this appeal, Osborne raises questions as to the rules relieving an actor from liability. She argues that the superior court erred in instructing the jury concerning the principles of superseding cause.

The court gave two instructions on superseding cause. Instruction 30 related to the conduct of some unknown individual or individuals in flipping the circuit breaker connected to the exposed wires into the "on" position and pulling the wires out of the electrical box into which Russell had coiled them. Instruction 31 related to the failure of Lamoureaux and Scheeler to correct the dangerous situation which they discovered on the morning of the accident. Each of the foregoing bears discussion.

### A.

Instruction 30 provided:

A superseding cause is an act of a third person or other force which by its intervention prevents the defendant from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

Normally, in order to satisfy the substantial factor test it must be shown both that the accident would not have happened 'but for' the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable men would regard it as a cause and attach legal responsibility to it.

However, a defendant's negligence is not the proximate cause of an injury if some other independent cause combines with the defendant's negligence to cause the injury and you find this other cause meets all of the following three requirements:

(1) the harmful effects of the other cause occurred after the defendant's negligence;

(2) the other cause was not reasonably foreseeable; and

(3) the other cause brought about a result different in kind than what could be reasonably expected from the defendant's negligence.

The second paragraph of the above instruction states the "substantial factor" test for causation first announced by this court in *State v. Abbott,* 498 P.2d 712, 727 (Alaska 1972). Osborne apparently concedes that there is a jury question regarding whether Russell's failure to insulate was a substantial factor in bringing about decedent's electrocution.[7] On the other hand, Osborne takes exception to the court's having given the first and third paragraphs of Instruction 30. She argues that the fact that someone flipped over the circuit breaker and pulled out the wires does not, as a matter of law, amount to a superseding cause. We agree with this contention and therefore hold that the superior court erred insofar as it instructed the jury that it could find that Russell was relieved of liability by such conduct.

In *Sharp v. Fairbanks North Star Borough,* 569 P.2d 178 (Alaska 1977), we recognized that even if a defendant's conduct is a substantial factor in causing an injury, it may be held not to be a legal cause of the injury. We stated that this is the case "where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." *Id.* at 182 (quoting Restatement (Second) of Torts § 435 (1965)); *see also Yukon Equipment, Inc. v. Fireman's Fund Insurance Co.,* 585 P.2d 1206, 1211 (Alaska 1978); *Yukon Equipment, Inc. v. Gordon,* 660 P.2d 428, 433 n. 3 (Alaska 1983). We have also endorsed Professor Prosser's position that "intervening causes which lie

---

**7.** A jury might reasonably conclude that Russell's conduct was not a substantial factor in causing the accident. It is therefore necessary that this question of fact be presented to a jury on remand. *Cf. Morris v. Farley Enterprises,* *Inc.,* 661 P.2d 167, 169 (Alaska 1983) (holding issue of substantial factor causation presented a jury question in a case where negligence and superseding cause issues were resolved as a matter of law).

within the scope of the foreseeable risk, or have at least some reasonable connection with it" are not superseding causes which relieve the initial tortfeasor from liability. W. Prosser, Handbook of the Law of Torts § 44 at 281 (4th ed. 1971); *see Sharp,* 569 P.2d at 182 n. 9; *Morris,* 661 P.2d at 170.

Analytically, this is simply a problem of determining whether the duty imposed by the cited National Electrical Code provisions was designed to protect against the risk of harm through the intervention of another force. *See* Restatement (Second) of Torts § 435 comment c (1965). We think it is clear that in this case the duty imposed was designed to protect against such a possibility. The risk that an intervening force would cause the exposed wires to become deadly is the very risk which rendered Russell's failure to insulate negligent. Absent such intervention, his conduct could not have resulted in an injury. "Where the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause." Restatement (Second) of Torts § 442A (1965); *see also Sharp,* 569 P.2d at 182 n. 9 ("When a defendant has created a situation acted upon by an intervening force, he is liable if the negligent conduct of an intervening third person could have been anticipated by the defendant and the risk of such intervention was unreasonable.")[8] It would be incongruous to first conclude that Russell's failure to insulate, harmless in itself, constituted negligence as a matter of law, and then hold that it is a jury question whether he is relieved of liability because the intervention which he negligently risked actually occurred.

## B.

Instruction 31 provided:

The failure of a third person to act to prevent harm to another threatened by the defendant's negligent conduct is not a superseding cause of such harm.

However, where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the defendant's negligent conduct is found to have shifted from the defendant to a third person, the failure of the third person to prevent such harm is a superseding cause.

Various factors will enter into it. Among them are the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time and any other factors and the interplay of all such factors and circumstances as shown by the evidence in this case.

This instruction was apparently related to evidence presented that Lamoureaux and his handyman, Scheeler, discovered the exposed wires that were protruding from the junction box and "hot," but failed to correct the dangerous situation. Osborne argues that this was insufficient evidence to justify a conclusion that Russell's duty to prevent harm had shifted to another person. She argues that it was therefore error for

---

**8.** This case is analogous to *Lawrence v. Kamco, Inc.,* 8 Mass.App. 854, 397 N.E.2d 1157 (1979). In that case a patron brought an action against a cocktail lounge owner seeking to recover for injuries resulting from an altercation in the lounge. One morning as the defendant arrived at his lounge he discovered that a window had been broken after closing time the night before, leaving a jagged hole. The proprietor allowed a piece of cardboard to be stapled to the frame on the outside of the building, rather than having the window immediately replaced. That evening the plaintiff was injured when he was jostled backward by certain patrons seated next to him at the bar, cutting plaintiff's hand on the jagged window glass. The court stated that the fact that the harm was brought about through the intervention of another force did not relieve the defendant of liability where his failure to replace the window increased the risk of a particular harm and was a substantial factor in causing that harm. 397 N.E.2d at 1160; *see also Campbell v. New Orleans Pub. Serv. Inc.,* 369 So.2d 733, 735 (La.Ct.App.1979); *Parness v. City of Tempe,* 123 Ariz. 460, 600 P.2d 764, 768–69 (Ariz.Ct.App.1979); *Concord Florida, Inc. v. Lewin,* 341 So.2d 242, 245 (Fla. Dist.Ct.App.1976); *Doyle v. Nor-West Pac. Co.,* 23 Wash.App. 1, 594 P.2d 938, 941 (1979).

the court to give the instruction. Presumably she does not contest the first paragraph of the instruction.

■ Instruction 31 is taken in large part from Restatement (Second) of Torts § 452 (1965).[9] Its third paragraph, however, states factors for a *court* to consider in deciding whether it should give the instruction stated in the second paragraph, which reiterates § 452(2). *See* Restatement (Second) of Torts § 452 comment f (1965). This is not a determination to be made by the jury. Thus, the instruction was erroneous for this reason. But even aside from this deficiency in Instruction 31, we hold that it was erroneous insofar as it indicated to the jury that it could find that Russell's duty had shifted so as to relieve him of responsibility, since the jury could not reasonably have found facts which would justify such a conclusion. *See* Restatement (Second) of Torts § 453 comment c (1965).

■ The duty to prevent harm to another threatened by an actor's negligent conduct shifts to a third person only in exceptional cases.[10] Comment e to § 452 states that where "there is no rule of law, and no reason of policy to prevent its transfer, and [where] there is clear understanding that it is to be shifted, the original actor can be relieved of his duty...." Certainly that is not the case here, since there was no evidence presented at trial of an understanding between Russell and a third party that the third party would correct the danger posed by the exposed wires. Comment f to § 452 states that "[e]ven in the absence of any contract or agreement, the circumstances may be such that the court will find that all duty and responsibility for prevention of the harm has passed to the third person." But this case does not present such extraordinary circumstances. Indeed, Russell's own testimony was to the contrary. As the electrician on the job, he stated that it was his responsibility to see that the building passed the final municipal electrical inspection. He testified that this meant that without regard to when the accident occurred, it was his responsibility to make sure that the exposed wires were covered up or somehow rendered harmless.

■ Having considered the degree of danger presented by the exposed wires, the character and position of Russell in relation to Lamoureaux and his handyman, and Russell's own testimony concerning the scope of his duty, we hold that this is not a rare case where the original actor's duty has shifted. It was therefore error to give Instruction 31.[11]

### III

In his cross-appeal, Russell argues that the superior court erroneously instructed the jury concerning the measure of dam-

---

**9.** Restatement (Second) of Torts § 452 (1965) provides:

> (1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.
> (2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

**10.** *See* Restatement (Second) of Torts § 452 comments d and e and illustrations 1–7 (1965). *Fish v. Los Angeles Dodgers Baseball Club*, 56 Cal.App.3d 620, 128 Cal.Rptr. 807, 818–21 (1976) is an example of cases employing the ordinary rule; that is, that the failure of a third person to act is not a superseding cause. In that case a fourteen-year-old boy died after being struck by a foul ball at a baseball game. A physician who examined the decedent at the ball park failed to ascertain the extent of his injuries, and allowed him to resume normal activities shortly after the injury. The boy was later rushed to a hospital where he died. The defendants argued that the physician was relieved of liability by the hospital's failure to provide adequate emergency treatment. On appeal, the court stated that the hospital staff's failure to provide adequate treatment could not relieve the doctor of liability, and that it was error to fail to instruct the jury to that effect. *See also Gordon v. Niagara Mach. & Tool Works*, 574 F.2d 1182, 1192–94 (5th Cir.1978); *Miller v. Bd. of Educ.*, 291 N.Y. 25, 50 N.E.2d 529, 531 (1943); *Diehl v. Fidelity-Philadelphia Trust Co.*, 159 Pa.Super. 513, 49 A.2d 190, 192 (1946); *compare Meuller v. Jeffrey Mfg. Co.*, 494 F.Supp. 275, 277–79 (E.D.Pa.1980).

**11.** Osborne also contests Instruction 18, which provided:

> Evidence as to any oral admissions, claimed to have been made outside of court

ages for the wrongful death of a person leaving no dependents. Instruction 32 provided in part:

> In a case such as this where the deceased leaves no wife or children surviving him, compensatory damages recoverable on behalf of the estate of the deceased are limited to the following:
>
> 1. pecuniary loss to the estate of the deceased;
>
> 2. damages for any pain and suffering experienced by the deceased prior to death and caused by the accident.

Instruction 33 provided:

> Pecuniary loss to the estate is the amount of decedent's probable future

earnings diminished by the amount he would have spent for his own living expenses had he lived.

Grief, sorrow, and loss of companionship, comfort or society are not to be regarded as items of pecuniary loss for the purposes of any award.

██ Russell's first point is that in all actions brought under Alaska's wrongful death statute, AS 09.55.580,[12] the proper measure of damages is loss to the beneficiaries, such loss being equal to the value of probable contributions which the deceased would have made to the beneficiaries had he lived. He argues that this measure applies whether or not the deceased leaves

---

by a party to any case, should always be considered with caution and weighed with great care. The person making the alleged admission may have been mistaken, or may not have expressed clearly the meaning intended; or the witness testifying to an alleged admission may have misunderstood, or may have misquoted what was actually said.

However, when an oral admission made outside of court is proved by reliable evidence, such an admission may be treated as trustworthy, and should be considered along with all other evidence in the case.

This is a standard jury instruction regarding admissions of a party. *See* California Jury Instructions—Civil, B.A.J.I. 2.25 (1977). Although it is perhaps unnecessary to this case, it is a correct statement of law. *See Crawford v. Alioto,* 105 Cal.App.2d 45, 233 P.2d 148, 151–52 (1951); *Blue River Sawmills, Ltd. v. Gates,* 225 Or. 439, 358 P.2d 239, 254 (1960). The court did not err in giving it.

**12.** AS 09.55.580 provides:

(a) When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action, had he lived, against the latter for an injury done by the same act or omission. The action shall be commenced within two years after the death, and the damages therein shall be such damages as the court or jury may consider fair and just, and the amount recovered, if any, shall be exclusively for the benefit of the decedent's husband or wife and children when he or she leaves a husband, wife or children, him or her surviving, or other dependents. When the decedent leaves no husband, wife or children surviving him or her or other dependents, the amount recovered shall be administered as other personal property of the deceased person but shall be

limited to pecuniary loss. When the plaintiff prevails, the trial court shall determine the allowable costs and expenses of the action and may, in its discretion, require notice and hearing thereon. The amount recovered shall be distributed only after payment of all costs and expenses of suit and debts and expenses of administration.

(b) The damages recoverable under this section shall be limited to those which are the natural and proximate consequence of the negligent or wrongful act or omission of another.

(c) In fixing the amount of damages to be awarded under this section, the court or jury shall consider all the facts and circumstances and from them fix the award at a sum which will fairly compensate for the injury resulting from the death. In determining the amount of the award, the court or jury shall consider but is not limited to the following:

(1) deprivation of the expectation of pecuniary benefits to the beneficiary or beneficiaries, without regard to age thereof, that would have resulted from the continued life of the deceased and without regard to probable accumulations of what the deceased may have saved during his lifetime;

(2) loss of contributions for support;

(3) loss of assistance or services irrespective of age or relationship of decedent to the beneficiary or beneficiaries;

(4) loss of consortium;

(5) loss of prospective training and education;

(6) medical and funeral expenses.

(d) The death of a beneficiary or beneficiaries before judgment does not affect the amount of damages recoverable under this section.

(e) The right of action granted by this section is not abated by the death of a person named or to be named the defendant.

·

statutory dependents. However, in *Matter of Estate of Pushruk,* 562 P.2d 329 (Alaska 1977), we expressed a contrary interpretation of AS 09.55.580:

> [I]f the decedent is survived by a spouse, child or dependent, the action is brought on behalf of the statutory beneficiary and damages are measured by the loss to the survivors. The personal representative is then a nominal party only and holds the recovery in trust. On the other hand, if the deceased is not survived by the beneficiaries named in the statute, the personal representative is the real party in interest in the wrongful death action. *Damages are limited to the loss to the estate* and are distributed as other personal property of the deceased.

562 P.2d at 331 (footnote omitted, emphasis added); *see also Macey v. United States,* 454 F.Supp. 684, 686 (D.Alaska 1978) (applying Alaska law); *Leavitt v. Gillaspie,* 443 P.2d 61, 69 (Alaska 1968); S. Speiser, Recovery for Wrongful Death 2d § 3:2, at 121 n. 45 (1975). This argument by Russell is therefore rejected.

Russell's second point is that the court's instruction was erroneous because it failed to apply a "net accumulations" theory. Under this theory, the loss to the estate equals the amount which the deceased would have earned by his own efforts and saved (from the time of his death to the time he probably would have died had he not been wrongfully killed) and left at his death as part of his estate. This is in contrast to the more prevalent theory, and the one applied by the court in this case, which is that the loss to the estate equals the decedent's probable future earnings, diminished by the amount he would have spent for his own living expenses had he survived. *See* Speiser, § 3:2, at 122–24. However, we see little reason to select either of these theories in favor of the other, since in cases where damages are recovered for the loss to the estate they will necessarily render nearly identical results.

Both theories begin by estimating the deceased's future gross income due to his own efforts. They differ in what is to be deducted from this amount; the net earnings theory deducts only that amount which the deceased would have spent on his own living expenses, while the net accumulations theory deducts this amount plus whatever amount the deceased would have expended on dependents. *See* Speiser, § 3:63, at 370. But under the Alaska statutory scheme the amount which the deceased would have expended on dependents will necessarily be equal to zero when loss to the estate recovery applies, since that measure of recovery is used only when there are no dependents. Further, the possibility that the deceased would later have acquired dependents toward whom he would have expended sums has been ruled by this court to be too speculative a matter for a jury to consider. *See Matter of Estate of Pushruk,* 562 P.2d at 332. Thus, loss to the estate recovery presumes an absence of dependents throughout the deceased's life expectancy. The net earnings theory and the net accumulations theory are therefore alternative measures of the same amount when determining loss to the estate under AS 09.55.580—the probable value of the deceased's estate had he not prematurely expired less the actual value of the estate at death.[13] Consequently we discern no reversible error in the manner in which the court instructed the jury on damages in this case.

The judgment of the superior court is REVERSED and REMANDED for further proceedings in accordance with this opinion.

CONNOR, J., not participating.

---

**13.** Of course these two measures could render different results if a jury were convinced that the deceased would have made substantial contributions to others not his dependents under AS 09.55.580, such as charities for example. That distinction would not appear to be cause for reversal in this case had the jury awarded damages, however.